In the Matter of the Estate of HAZEL A. LECKIE, Deceased. JEAN KAUFFMAN et al., Appellants; WILLIAM J. McDONALD, Respondent.

Fourth Department, November 5, 1976

*Bonney & Nicit (J. J. Nicit* of counsel), for appellants.

*Bond, McDonald & Toole (William McDonald* of counsel), for respondent.

MARSH, P. J. Petitioners Jean Kauffman and Andrew F. Leckie appeal from an order of Surrogate's Court, Ontario County, which dismissed their petition and granted respondent William J. McDonald's motion for summary judgment. Petitioners allege that decedent Hazel A. Leckie died on February 28, 1972 and that her will had been offered for probate by respondent William J. McDonald who was by such will designated as executor and primary beneficiary. Petitioners had filed objections as contingent remaindermen under a trust over which Hazel Leckie had a testamentary general power of appointment. The objections were withdrawn and probate of the will was had on November 15, 1972, in accordance with a compromise agreement which was reduced to writing on December 12, 1972. As a result of the compromise agreement, respondent, as executor and principal beneficiary, agreed to split the principal of the trust in two equal shares, one share going to respondent and the other share to petitioners-appellants: "Jean Kauffman and Andrew F. Leckie agree

to accept and William J. McDonald agrees that they shall be paid one-half of the principal of the Trust Fund set forth under Paragraph '4' of the Last Will and Testament *as of the date of appointment of the executor, November 15, 1972,* plus all interest accrued on said amount from November 15, 1972 to date of payment, less the pro-rata share of federal and state income and estate taxes, executor's statutory commissions and attorney's fees and disbursements based on the minimum fee schedule of Ontario County" (emphasis added).

Petitioners sought an order from the Surrogate requiring respondent to disclose a detailed accounting of the assets contained in the trust agreement referred to in paragraph 4 of the will and to perform the compromise agreement by paying over one half the trust corpus as of November 15, 1972, together with interest.

On March 3, 1972 respondent William J. McDonald petitioned the Surrogate of Ontario County for probate of the last will and testament of Hazel A. Leckie and the issuance of letters testamentary to petitioner William J. McDonald. The probate petition recited the death of Hazel A. Leckie as February 28, 1972, leaving her surviving as distributees who would take in intestacy two sisters and two brothers, none of whom were mentioned in decedent's will. In paragraph 3 of her will decedent made eight specific bequests. Two of the bequests are for $10,000 cash amounts and the remainder in specific personalty. One of the cash bequests was revoked by a codicil executed two years later. Paragraph 4 of the will purports to exercise a general power of appointment granted by a trust agreement dated July 22, 1965, by exercising it in favor of the residuary estate of the donee of the power: "4. Under the provisions of a Trust Agreement, dated July 22, 1965, by and between my late husband, ANDREW F. LECKIE, SR., the grantor, and THE HUNTINGTON NATIONAL BANK OF COLUMBUS, OHIO, the Trustee, I was given a power to direct the disposition of certain property. I hereby exercise the said power of appointment granted to me by said instrument, and direct that all property subject thereto shall become and be a part of my residuary estate, and disposed of as hereinafter provided."

Paragraph 5 of the will of decedent leaves the residuary estate to respondent William J. McDonald: "5. All the rest, residue and remainder of the property which I may own at the time of my death, real and personal, and including any

property over which I may have any power of appointment, I bequeath and devise to my said friend and attorney, WILLIAM J. MCDONALD, of Geneva, New York, if he shall survive me, absolutely and forever. In the event that he shall not survive me, I bequeath and devise all of the said residue of my estate to his wife, ELIZABETH J. MCDONALD, if she shall survive me, absolutely and forever."

Paragraph 7 of decedent's will appoints respondent executor thereof. A decree admitting the will to probate was signed on November 15, 1972 and an order of the Surrogate approving the agreement of compromise was signed on April 23, 1973. The order approving the agreement of compromise additionally provided that the Huntington National Bank of Columbus, Ohio, pay over to respondent William J. McDonald all the sums in its control belonging to the estate of Hazel A. Leckie. The compromise agreement itself, in addition to splitting the trust corpus between petitioners-appellants, Jean Kauffman and Andrew F. Leckie, and respondent, William J. McDonald, also provided for a $40,000 cash payment from the estate to four surviving brothers and sisters (20% each) and apparently four children of a deceased sibling (5% each).

In an apparent attempt to fulfill his obligation under the compromise agreement, respondent, on the stationery of his law office, sent a letter to Bonney and Nicit, attorneys for petitioners, enclosing a check for $81,400. The letter provided:

"Dear John:

"Enclosed herewith is a draft in the sum of $81,400.00. I have computed the figures as follows:

"The trust fund is approximately 63% of the estate.

"The total taxes, disbursements, commissions and attorneys' fees total $102,320.50

"One-half of 63% of this figure is 32,230.00

"Leaving a balance due of 91,400.00

"I have retained $10,000.00 in the event of any tax deficiencies. If you have any questions, do not hesitate to contact me."

In a letter dated September 18, 1973 petitioners' attorneys acknowledged the receipt of the $81,400 check and a copy of the Federal estate tax return. That letter states:

"We agree with your arithmetic i.e.

"1. That $247,263., d/d Trust Value, is 63% of the $392,480 gross estate.

"2. That one-half of 63% of $102,320. taxes, etc. is $32,230.

"3. That one-half of $247,263 equals $123,631.

"4. That $123,631. minus $32,230 equals $91,401.

"The above, however, treats only of principal using a date of death value of the trust. Never having seen an inventory of the trust securities we do not know what their principal value was as of November 15, 1972.

"More important, our compromise agreement provides that you shall pay all interest accrued on the principal value at November 15, 1972 from November 15, 1972 to date of payment.

"Will you kindly furnish us an inventory of the trust securities and cash as of November 15, 1972 which will include interest rates, maturity dates and principal amounts so that we may be able to arrive at correct principal values and interest accruals.

"While awaiting the above, we shall proceed to disburse the $81,400. which you sent us, which was just honored today."

The next correspondence from respondent is dated March 12, 1975 wherein it provides as follows:

"Gentlemen:

"Enclosed herewith is a draft in the sum of $6,986.07 which represents the full and final payment due under the compromise agreement in the above named estate including the balance of the principal and all interest accruals. I have not retained any for audit on income tax returns, but if there is any change, I will of course rely on you to obtain any amounts due from your clients.

"The amount of the check was computed as follows:

"Deficiency Federal and State Estate Tax was in the total sum of                                                         $14,906.79

"One-half of 63% of this figure is                          4,695.64

Leaving a Balance due on the $10,000.00 retained of 5,304.36

"I am enclosing copies of the estate's Federal Income Tax Returns for 1972, 1973 and 1974. In the year 1972 the income was $4,924.00, the Federal tax was $460.86 and the State tax was $74.67. The difference multiplied by 63% and divided by one-half and prorated from November 15th equals your share of the 1972 income in the amount of $172.80.

"The 1973 income was $4,368.00, the Federal tax was

$626.00, the State tax of $106.72. The difference multipled by 63% and divided by two is your clients' share in the sum of $1,145.11. I have figured the whole amount even though the payment of $81,400.00 was paid to you on September 10, 1973.

"The 1974 income was $4,390.00, the Federal tax was $631.00 and the State tax of $107.60. The deficiencies were paid about May 1, 1974 and your share of the income was .0996 and the difference multiplied by .0996 divided by two equals you clients' share of the $363.80.

"If you have any questions concerning the same, do not hesitate to contact me."

Appellants' attorneys responded on March 20:

"Dear Bill:

"This will acknowledge receipt of yours of March 12, 1975 with contents.

"On reviewing our file I find that we wrote you on September 18, 1973, copy of which letter is enclosed. It is clear that by the terms of our letter we reserved the rights of our clients in respect to any capital gains occurring between date of Death (February 28, 1972) and November 15, 1972. You never answered our letter.

"Before we can endorse your $6,986.07 check which bears the notation 'final payment in full settlement all claims' we must have an inventory of the trust assets as of February 28, 1972 and as of November 15, 1972. We feel sure that the trustee has furnished you with this material and that you can readily make copies for us."

On March 24, 1975 petitioners had the check for $6,986.07 enclosed with the March 12 communication from respondent certified, which check stated on its face "final payment in full setlement all claims".

For the first time in a letter dated April 1, 1975, respondent William J. McDonald indicated that a dispute existed with respect to the construction of the compromise agreement, asserting that the corpus should be divided as of the date of death value as opposed to November 15, 1972, the date when the executor was appointed and the date specified in the compromise agreement:

"Dear Ted:

"I have reviewed the original Agreement and find nothing in it in respect to capital gains. If you check with your partner, John, I am sure that he will tell you the capital gains

or losses were not thought about, not discussed and not agreed upon. The whole amount, prorating of expenses, etc., was based on the value at the time of death.

"I don't know whether or not there were gains or losses as it was not necessary to ascertain this."

The last communication between respondent and petitioners' counsel again asserted the date for valuing the trust corpus for division purposes as of November 15, 1972 as expressed in the compromise agreement and requested a written inventory of the trust assets:

"Dear Bill:

"This is in reply to your letter of April 1, 1975. If you will review the original Agreement once more, namely, the last paragraph on page 2 thereof, you will find that you agree to pay one-half of the principal of the trust fund as of the date of appointment of the executor, November 15, 1972, plus all interest accrued on said amount from November 15, 1972 to date of payment, less certain specified deductions. So far, we have never been furnished with an inventory of the trust securities and cash as of November 15, 1972, although I have asked for it in my letter to you of September 18, 1973. If there were capital gains in the trust inventory between the date of death and November 15, 1972, our clients are entitled to the benefit of the same.

"So far the only information you have given us relative to valuation is the information contained in your estate tax letter showing the value of the trust at the date of death.

"We again request that you send us an inventory as of November 15, 1972, in full detail."

With the parties taking the above positions, petitioners sought an order requiring respondent to supply an inventory of the trust assets and to comply with the compromise agreement. In a reply affidavit to the petition, respondent asserted that the certification of the March 12 check in the amount of $6,986.07 was equivalent to a negotiation and acceptance under section 3-411 of the Uniform Commercial Code and thus constituted an accord and satisfaction. Respondent also crossmoved to reform the compromise agreement on the basis of mutual mistake in order to reflect the actual agreement of the parties which was that the value and division of the trust corpus between respondent and petitioners should be as of the date of death and not on November 15, 1972. Judge CRIBB held

in a written decision that the certification of the March 12 check on March 24 constituted an acceptance of respondent's offer to compromise and an accord and satisfaction.

The Surrogate cites *Carlton Credit Corp. v Atlantic Refining Co.* (12 AD2d 613, affd 10 NY2d 723) for the proposition that an accord and satisfaction is made out where a debtor transmits a check to his creditor containing a noted condition that an acceptance by negotiation of the check constitutes a full payment for the items referred to in the letter of transmittal, and the creditor then accepts and negotiates the check. In so accepting and negotiating the check, the creditor thereby has accepted it upon the conditions stated by the debtor, thus establishing an accord and satisfaction. The amount owing between the parties however must be unliquidated, that is, in dispute.

"The covering letter clearly conditioned the check upon its being payment in full for the moneys owed the plaintiff under the charter party on which this suit is based. The plaintiff could not accept the payment and reject the condition. * * * It was fully aware of the attempt to satisfy the amount claimed with a lesser payment but despite that it accepted the check with the condition imposed. True, it is stated there was no intention to accept the check in full satisfaction and protest was registered. However, such protest is unavailing. For, as was said by Judge CARDOZO * * * 'What is said is overridden by what is done, and assent is imputed as an inference of law' " *(Carlton Credit Corp. v Atlantic Refining Co.,* 12 AD2d 613).

In *Schnell v Perlmon* (238 NY 362) the plaintiffs sold to the defendant 10 carloads of spanish onions pursuant to a written contract. They were shipped FOB New York and delivered to Detroit. They were found by United States Department of Agriculture inspection to be rotten to a substantial degree. These inspection reports were mailed to defendant, and the defendant notified plaintiffs by letter regarding this condition and sent them copies of the government official's report. Sometime thereafter checks were mailed to plaintiffs with a note contained on the back which stated that they were payment in full for the balance owing for the onions. Plaintiffs credited the amounts of the checks and demanded the balance. Defendant resisted the claim for the balance citing an accord and satisfaction. The court discussed the general rule with respect to accord and satisfaction within the context of a

unilateral request by the debtor that part payment be accepted in satisfaction of the entire obligation. " 'Where the demand is liquidated, and the liability of the debtor is not in good faith disputed, a different rule has been applied. In such cases the acceptance of a less sum than is creditor's due, will not of itself discharge the debt, even if a receipt in full is given' " (p 368).

On the other hand, the Court of Appeals continued (p 368): " 'Now it is the settled law of this state that if a debt or claim be disputed or contingent at the time of payment, the payment, when accepted, of a part of the whole debt is a good satisfaction and it matters not that there was no solid foundation for the dispute.' * * * 'It is only in cases where dispute has arisen between the parties as to the amount due and a check is tendered on one side in full satisfaction of the matter in controversy that the other party will be deemed to have acquiesced in the amount offered by an acceptance and retention of the check.' The term 'liquidated' therefore, when used in connection with the subject of accord and satisfaction has reference to a claim which the debtor does not dispute; a claim which he admits to be due but attempts to satisfy by payment of a smaller amount. * * * 'A demand is not liquidated, even if it appears that something is due, unless it appears how much is due; and when it is admitted that one of two specific sums is due, but there is a genuine dispute as to which is the proper amount, the demand is regarded as unliquidated, within the meaning of that term as applied to the subject of accord and satisfaction.' "

The court in *Schnell v Perlmon* held that the amount claimed by plaintiffs was not admitted to be due by defendants but that there was a substantial and serious dispute with respect to the actual amount owing due to the rotten state of the onions when delivered at Detroit, such rotten state being substantiated by certificates issued by the United States Department of Agriculture inspectors. It was held that plaintiff was bound by an accord and satisfaction by the acceptance of the checks and promissory note with the full payment notation thereon within the context of a substantial and bona fide dispute over the actual amount due under the contract.

The Court of Appeals in *Schnell v Perlmon* cited several cases on the nature of the dispute which must exist with respect to the amount due before an accord and satisfaction will be inferred.

" 'The law wisely favors settlements, and where there is a real and genuine contest between the parties and a settlement is had without fraud or misrepresentation for an amount determined upon as a compromise between the conflicting claims such settlement should be upheld, although such amount is materially less than the amount claimed by the person to whom it is paid.' * * *

" 'If there be a *bona fide* dispute as to the amount due, such dispute may be the subject of a compromise and payment of a certain sum as a satisfaction of the entire claim, but where the larger sum is admitted to be due, or the circumstances of the case showed that there was no good reason to doubt that it was due, the release of the whole upon payment of part will not be considered as a compromise , but will be treated as without consideration and void.' " *(Schnell v Perlmon, supra,* p 373; see also *Nassoiy v Tomlinson,* 148 NY 326; *Simons v American Legion of Honor,* 178 NY 263.)

The requirement that there exist a bona fide dispute appears as the substantial question at issue in most of the leading accord and satisfaction cases of the unilateral offer type. "Unless there exists a genuine controversy concerning the amount due, mere payment by one party of a sum less than the whole of the claim and its acceptance by the other do not erect a foundation for such a settlement as may be deemed an accord and satisfaction. An indispensable element contributing to the establishment of this defense consists in an actual and substantial difference of opinion. One must assert the validity of his claim and the other must in good faith deny all or part of it. His denial cannot be fabricated for use as a pretext to evade the discharge of an obligation. Disclaimer must be *bona fide* and based upon real faith that the demand is not meritorious. The debtor must honestly hold the opinion either that he owes nothing or that he is bound only to the extent of paying less than his adversary seeks to exact. Compensation by the debtor up to an amount concededly due and rejection by him of a balance representing the subject of dispute even when accepted by the creditor cannot be regarded as anything in excess of a partial payment, but the tender of a sum, less than one representing a claim asserted but in good faith disputed, as a complete discharge of all indebtedness and its acceptance by the creditor under such conditions create premises from which the conclusion must follow that the creditor acquiesces in the amount offered. Such

a tender and acceptance satisfies the doctrine of accord and satisfaction. The dispute need not rest upon factors arising from sound reasons. The debtor may be wrong in his contention. That he honestly believes in the correctness of his position is enough." *(Schuttinger v Woodruff,* 259 NY 212, 216-217.)

A reading of the instant record does not establish the existence of a bona fide dispute between petitioners and respondent as of the March 12 letter and check. There is no dispute at that point, for petitioners had not been able to obtain an inventory of the trust assets so as to make a computation which would either agree or disagree with the date of death figures provided by respondent. Respondent had the undoubted duty as executor to provide an inventory of the trust assets for petitioners' use in determining whether payments from respondent corresponded to their rights under the compromise agreement. The reasons why respondent used the date of death value in dividing the trust instead of the date set out in the compromise agreement were not revealed until the letter of April 1, 1975 subsequent to the certification of the $6,986.07 check. The September 18, 1973 letter of the attorneys for petitioners asserted the compromise agreement date of November 15, 1972 for valuing the trust and requested an inventory. This request was ignored, no inventory was ever provided and no statement ever made with respect to the application of a date for valuing the trust other than that contained in the compromise agreement. Petitioners could well assume that the date of death value was used, as the computation had already been made for Federal estate tax purposes and that a further valuation would be made using the November 15, 1972 date contained in the compromise agreement for purposes of final settlement. As of March 12, 1975, petitioners were still seeking a list of the trust assets as of November 15, 1972. Respondent had not taken the position that a date other than that contained in the compromise agreement had application to the rights of the parties in valuing the trust, and no figure had emerged which either party asserted as the correct amount owing pursuant to the compromise agreement prior to the March 12 letter containing the final settlement check alleged to establish by respondent an accord and satisfaction.

For the reason that respondent did not establish the existence of a genuine controversy when he sent the March 12

letter, an accord and satisfaction was not established by petitioners' certification of the check in the amount of $6,986.07.

There is a further and persuasive reason for denying respondent the benefit of an accord and satisfaction. Respondent was an executor and as such had the duty to collect the proceeds of the 1965 trust paid over to the estate pursuant to paragraph 4 of the will by the Ohio Trust Company. His duty was to determine the amount due pursuant to the will as modified by the compromise agreement approved by the Surrogate. If he had a question as to the meaning of the compromise agreement, he should have sought a construction from the Surrogate. He also had a duty to provide copies of an inventory of the trust assets turned over to him to the petitioners so their counsel could verify the accuracy of payments made by the executor and whether they conformed to the amount due under the compromise agreement. Respondent's status comports to that of the plaintiff in *Hudson v Yonkers Fruit Co.* (258 NY 168). In that case the plaintiff requested the defendant to sell a quantity of apples as agent, collect the purchase price and remit it to plaintiff. Defendant sold the apples, collected the purchase price and remitted the purchase price less a deduction for commissions. Accompanying the remittance was a statement as to the nature and amount of the deductions. Plaintiff sued for the full purchase price and defendant claimed that the cashing of the check constituted an agreement to the deduction of the commissions detailed in the transmittal letter and that an accord and satisfaction was established. The Court of Appeals held to the contrary, reasoning that the proceeds received from the sale of the apples by the defendant as agent for the seller was not the money of the agent, and conditions could not be placed upon its transmittal to the plaintiff so as to establish the foundation for an accord and satisfaction.

"The question then is whether the acceptance of the check without approval of the deduction is to be viewed as the breach of a condition lawfully imposed. A debtor paying his own money may couple the payment with such conditions as he pleases * * *. The mere fact that he is a debtor does not deprive him of that privilege. If he has the title to the money, he may pick and choose among his creditors, or refusing to pay any one until coerced by legal process, may keep the money for himself. From this the rule has grown up in

connection with the satisfaction of unliquidated demands that one who sends a check to another upon a condition explicitly declared that the demand shall be extinguished or the check sent back unused, may hold the creditor to the condition, however embarrassing the choice". * * *

"In the case at hand the condition was not lawfully imposed, if we assume provisionally that it was imposed at all. The defendant was not merely a debtor, paying its own money, which it would have been free to retain or to disburse according to its pleasure. It was an agent, a fiduciary, accounting for money belonging to its principal. No matter whether the deduction of a commission was proper or improper, the balance represented by the check was due in any event. The law will not suffer an agent to withhold moneys collected for a principal's account by the pressure of a threat that no part of the moneys will be remitted to the owner without the approval of deductions beneficial to the agent. Such conduct is a flagrant abuse of the opportunities and powers of a fiduciary position * * *. The doctrine of accord and satisfaction by force of an assent that is merely constructive or imputed assumes as its foundation stone the existence of a condition lawfully imposed." *(Hudson v Yonkers Fruit Co., supra,* pp 172-174.)

There is no question but that respondent received the trust moneys from the Huntington National Bank of Columbus, Ohio, as a fiduciary charged with responsibility to implement the compromise agreement. The moneys rightfully belonging to petitioners were not the moneys of respondent and could not be withheld by respondent as a negotiating ploy with which to force petitioners to accept an arbitrary sum determined by respondent as owing under the compromise agreement. Upon the authority of *Hudson v Yonkers Fruit Co. (supra)* respondent should be denied the benefits of an accord and satisfaction.

With respect to the issue of whether a bona fide dispute existed, it would even appear that respondent himself realized the lack of such when he raised the issue of the date of death being the proper date for valuing the trust for the first time in the letter of April 1, 1975. He attempted to give substance to this by his cross motion to reform the compromise agreement. This belated attempt to reform the compromise agreement appears without merit and feigned. In any case, no bona fide dispute existed as of the date of the transmittal of the check asserted to establish an accord and satisfaction *(Zaharakis v*

*J.R.D. Mgt. Corp.,* 79 Misc 2d 1068). Nor could respondent as a fiduciary impose lawful conditions upon the payment of the trust funds in his hands to petitioners as a means of obtaining petitioners' agreement to a sum concededly owed to petitioners *(Hudson v Yonkers Fruit Co., supra).*

The order appealed from should be reversed with costs to petitioners payable by the respondent personally, respondent's defense of accord and satisfaction should be dismissed and the case remitted to the Ontario County Surrogate for further proceedings upon the petition and the cross petition seeking reformation.

MOULE, SIMONS, DILLON and WITMER, JJ., concur.

Order unanimously reversed with costs to petitioners payable by respondent personally, respondent's defense of accord and satisfaction dismissed, and matter remitted to Ontario County Surrogate's Court for further proceedings upon the petition and cross petition.